IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

BRYCE MILLER,                      )
                                   )
            Plaintiff,             )
                                   )
      v.                           )  Case No.
                                   )  10-4012-CV-C-REL-SSA
MICHAEL J. ASTRUE, Commissioner    )
of Social Security,                )
                                   )
            Defendant.             )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Bryce Miller seeks review of the final decision of
the Commissioner of Social Security denying plaintiff's
application for disability benefits under Titles II and XVI of
the Social Security Act ("the Act").  Plaintiff argues that the
ALJ erred in (1) finding plaintiff's mental impairment non-
severe, and (2) in discounting the opinions of Dr. Early and Dr.
Small.  I find that the substantial evidence in the record as a
whole supports the ALJ's finding that plaintiff is not disabled.
Therefore, plaintiff's motion for summary judgment will be denied
and the decision of the Commissioner will be affirmed.

## I.   BACKGROUND

On May 16, 2007, plaintiff applied for disability benefits
alleging that he had been disabled since September 30, 2004, and
later amended his onset date to April 15, 2006.  According to his
application, plaintiff's disability stems from carpal tunnel
syndrome, tendinitis, tennis elbow, pinched nerves, shattered

vertebrae, and asthma.  Plaintiff's application was denied on
August 10, 2007.  On September 17, 2009, a hearing was held
before an Administrative Law Judge.  On October 26, 2009, the ALJ
found that plaintiff was not under a "disability" as defined in
the Act.  On December 1, 2009, the Appeals Council denied
plaintiff's request for review.  Therefore, the decision of the
ALJ stands as the final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for
judicial review of a "final decision" of the Commissioner.  The
standard for judicial review by the federal district court is
whether the decision of the Commissioner was supported by
substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales,
402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847,
850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th
Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir.
1996).  The determination of whether the Commissioner's decision
is supported by substantial evidence requires review of the
entire record, considering the evidence in support of and in
opposition to the Commissioner's decision.  Universal Camera
Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876
F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into
consideration the weight of the evidence in the record and apply

a balancing test to evidence which is contradictory." <u>Wilcutts</u>
<u>v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing <u>Steadman v.</u>
<u>Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It
means such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion." <u>Richardson v. Perales</u>, 402
U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th
Cir. 1991).  However, the substantial evidence standard
presupposes a zone of choice within which the decision makers can
go either way, without interference by the courts.  "[A]n
administrative decision is not subject to reversal merely because
substantial evidence would have supported an opposite decision."
<u>Id</u>.; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

**III. *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS***

An individual claiming disability benefits has the burden of
proving he is unable to return to past relevant work by reason of
a medically-determinable physical or mental impairment which has
lasted or can be expected to last for a continuous period of not
less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the
plaintiff establishes that he is unable to return to past
relevant work because of the disability, the burden of persuasion
shifts to the Commissioner to establish that there is some other
type of substantial gainful activity in the national economy that

the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857

(8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo.

2000).

The Social Security Administration has promulgated detailed

regulations setting out a sequential evaluation process to

determine whether a claimant is disabled.  These regulations are

codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step

sequential evaluation process used by the Commissioner is

outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful
activity?

> Yes = not disabled.
> No = go to next step.

2.    Does the claimant have a severe impairment or a
combination of impairments which significantly limits his ability
to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment
in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.    Does the impairment prevent the claimant from doing
past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Com-
> missioner.

5.   Does the impairment prevent the claimant from doing any other work?

                    Yes = disabled.
                    No = not disabled.

## IV.  THE RECORD

The record consists of the testimony of plaintiff and vocational expert Gary Weimholt, in addition to documentary evidence admitted at the hearing.

## A.   ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

## Earnings Record

The record establishes that plaintiff earned the following income from 1993 through 2007:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1993 | $ 1,473.53 | 2001 | $ 7,715.01 |
| 1994 | 3,277.51 | 2002 | 4,673.23 |
| 1995 | 6,528.37 | 2003 | 12,017.21 |
| 1996 | 7,798.79 | 2004 | 5,921.04 |
| 1997 | 9,513.59 | 2005 | 1,396.50 |
| 1998 | 9,489.42 | 2006 | 518.00 |
| 1999 | 8,448.78 | 2007 | 29.25 |
| 2000 | 14,064.70 | | |

(Tr. at 135).

**Disability Report**

In an undated Disability Report plaintiff was asked why he stopped working, and he answered, "The tennis elbow kicked in and I had to go get a cortazone *[sic]* injection." (Tr. at 139). He listed the conditions that limit his ability to work as "Carpal tunnel, tendonitis, tennis elbow, pinched nerves, shattered vertebrae, asthma" (Tr. at 139). When asked how his conditions limit his ability to work, he answered, "I am limited on lifting, limited on time I can stand and sit, repetative *[sic]* bending tears me up." (Tr. at 139).

**Disability Report - Field Office**

On May 16, 2007, E. Thompson met face to face with plaintiff (Tr. at 156-159). E. Thompson observed that plaintiff had no difficulty with understanding, coherency, concentrating, talking, answering, sitting, standing, walking, using his hands, or writing (Tr. at 158). "He didn't appear to have any physical limitations; his mother was with him but he answered everything. At the point I got up to get papers, she asked him, 'What about your disease,' but he told her that didn't have anything to do with this, so I have no idea what it was. Perhaps the records will reflect another issue." (Tr. at 158).

**Function Report**

In a Function Report dated June 15, 2007, plaintiff
described his typical day:  wake up mid-morning, watch
television, smoke three or four cigarettes, eat a late afternoon
meal, call friends, smoke three or so cigarettes.  Sometimes he
tries to help his step father mow lawns.  On those days he gets
up and smokes, then he fixes a water jug and a small lunch.
Plaintiff uses the riding lawn mower and uses a weed eater for 30
minutes before resting.  He picks up limbs and debris.  He
usually works about four hours.  He fixes a TV dinner, smokes,
watches television, and then goes to bed around 10:30 p.m. (Tr.
at 165).  Plaintiff noted that he can only use a weed eater 30 to
40 minutes (Tr. at 166).  Plaintiff prepares his own meals,
cleans, does laundry, and irons (Tr. at 167).  He noted that he
gets depressed and has to be told by his mother to clean (Tr. at
167).  Plaintiff's hobbies included watching television, playing
pool about once a week, and observing motor sports (Tr. at 169).
Plaintiff was going to a pool hall weekly and to a social group
once a week (Tr. at 169).

When asked to circle all of the items affected by his
condition, plaintiff circled lifting, squatting, bending,
standing, reaching, walking, kneeling, stair climbing, memory
(but he wrote "ok" next to it), completing tasks, concentration

(again, he wrote "ok"), following instructions, using hands, and getting along with others (Tr. at 170). He did not circle sitting (Tr. at 170). He reported that he could walk 1/2 mile before needing to rest for ten to 15 minutes (Tr. at 170).

Plaintiff reported that he panics when his mother is unavailable (Tr. at 171). Plaintiff's mother wrote the following at the end of the form:

> Bryce was diagnosed w/Adrenal Genital Syndrome at age 6 weeks old. His body does not have an adrenal gland. He has taken some type of cortisone med since 6 wk old. This disease affects his stature in that people are usually short, as the Adrenal gland is necessary to grow. Therefore Bryce is short in stature.
>
> Bryce is unable to do tasks for a long period of time mainly due to his small build. It is hard for him to hold items in hands and he seems prone to injuries involving his bones – i.e., wrists, legs, back, arms, neck, shoulders.
>
> I have fully supported Bryce financially for the past 3 years. He is unable to keep a job due to his physical condition and his mental state is in question. He is very depressed as well.

(Tr. at 172).

**B.    *SUMMARY OF MEDICAL RECORDS***

Although plaintiff has alleged disability beginning April 15, 2006, the record reveals that he worked at least six months in 2007 (Tr. at 262, 266, 267, 280, 313) and at least one month in 2008 (Tr. at 322, 324) on construction or landscaping projects.

On January 5, 2006, plaintiff saw Modesta Tako, M.D., at the Family Health Center (Tr. at 271). He presented with complaints of depression (Tr. at 271). Plaintiff attributed his depression to his "job loss 2-3 months ago" (Tr. at 270-71). Dr. Tako recommended counseling and cautioned plaintiff against anti-depressant medication because the depression was "situational" (Tr. at 272). Dr. Tako prescribed Paxil for depression (Tr. at 271). Plaintiff discontinued his Paxil after taking it for "a couple of days" and "never bothered to call to get an alternate medication" (Tr. at 270).

On August 31, 2006, Michael Gardner, M.D., at the University of Missouri-Columbia Cosmopolitan International Diabetes and Endocrinology Clinic, performed an examination of plaintiff (Tr. at 248). Plaintiff presented with enlarged testes (Tr. at 248), which were attributed to "inconsistent taking" of steroid medication for congenital adrenal hyperplasia[1] (Tr. at 251).

_____

[1]Plaintiff's physicians variously describe this condition as congenital adrenal hyperplasia (Tr. at 236, 263, 310, 345, 375), adrenogenital syndrome (Tr. at 238, 268, 308), and congenital adrenal hypoplasia (Tr. at 243, 365). Plaintiff's endocrinologist (as well as the ALJ) consistently referred to the condition as congenital adrenal hyperplasia ("CAH") (Tr. at 345, 350, 10). Hereinafter, the condition will be referred to as CAH. Congenital adrenal hyperplasia can affect both boys and girls. People with CAH lack an enzyme needed by the adrenal gland to make the hormones cortisol and aldosterone. Without these hormones, the body produces more androgen, a type of male sex hormone. This causes male characteristics to appear early (or inappropriately). Boys do not have any obvious problems at birth. However, they may appear to enter puberty as early as two

Plaintiff reported that he was "doubling up" on his steroids two to three times per week "to combat fatigue/depression" (Tr. at 248). Plaintiff also stated that he had not seen an endocrinologist in approximately nine years (Tr. at 248). Attending physician Uzma Khan, M.D., also evaluated plaintiff and adjusted steroid medication dosages (Tr. at 251). Plaintiff returned for follow-up care and adjustment of dosages on October 19 and 31, 2006 (Tr. at 258, 257).

Plaintiff returned to the Family Health Center on February 1, 2007, for treatment of depression (Tr. at 270). Plaintiff reported that he had been unemployed for one and one-half years and was too depressed to get out of bed or look for a job (Tr. at 270). Dr. Tako referred plaintiff to a social worker for career and financial counseling and prescribed Lexapro for plaintiff's depression (Tr. at 270).

On February 5, 2007, plaintiff returned to the Family Health Center to meet with Jessica Hall, a social work intern (Tr. at 269). Ms. Hall recommended that plaintiff continue pursuing employment with a job placement agency and consider credit

---

to three years of age. Changes may include deep voice, early appearance of pubic and armpit hair, early development of male characteristics, enlarged penis, small testes, and well-developed muscles. Both boys and girls will be tall as children but much shorter than normal as adults. Medline Plus, U.S. National Library of Medicine, http://www.nlm.nih.gov/medlineplus/ency/article/000411.htm

counseling services and medication and housing programs (Tr. at 269). Plaintiff indicated a concern for possible bipolar disorder, and Ms. Hall referred him for evaluation (Tr. at 269).

Plaintiff saw Dr. Tako at the Family Health Center on March 1, 2007, for a follow-up visit (Tr. at 268). Dr. Tako noted that the Lexapro "seems to be working" (Tr. at 268). Plaintiff reported that he felt "much better" at this time (Tr. at 268). The physician again noted that plaintiff's depression "was mainly situational" and related to his unemployment and living situation (Tr. at 268). Dr. Tako refilled plaintiff's Lexapro prescription and recommended plaintiff meet again with a social worker for help with employment options (Tr. at 268).

Plaintiff returned to the Family Health Center on March 16, 2007, reporting pain in his right arm and elbow (Tr. at 267). Plaintiff complained that it hurt to grasp or grip with his right hand following seven to ten days of lifting "a lot" of shingles and other materials at a construction project (Tr. at 267). Beth Sweeney, APRN, advised plaintiff to ice and wrap his arm and to minimize lifting (Tr. at 267). Dr. Tako recommended that plaintiff use ibuprofen to alleviate pain and follow up with the clinic if the pain persists (Tr. at 267).

Plaintiff returned to the Family Health Center for treatment of his elbow on April 23, 2007 (Tr. at 266). Plaintiff reported

that ice and ibuprofen improved the condition, but "whenever he works with a weed whip or floor mopping, the arm flares up again" (Tr. at 266). Plaintiff also stated that he had stopped taking Lexapro (Tr. at 266). The nurse practitioner, Beth Brandon, recommended ice and ibuprofen and avoidance of heavy lifting and scheduled plaintiff for a steroid injection at the elbow (Tr. at 266).

On April 24, 2007, Jason Holman, M.D., of the Family Health Center, gave plaintiff a steroid injection in his right elbow (Tr. at 262). Plaintiff also reported that he suffered from back pain, but it was "currently controlled" (Tr. at 263). Plaintiff was assessed with nicotine addiction: "The patient is not quite ready to quit smoking, but he was encouraged to quit. Complications and risks were discussed with this addiction as well as the cost."

On August 2, 2007, Eddie Runde, M.D., an occupational and environmental medicine specialist, performed a consultative examination evaluating plaintiff for complaints of bilateral carpal tunnel syndrome, bilateral hand tendinitis, right tennis elbow, pinched nerves in his neck, and "shattered" vertebrae (Tr. at 280). For each condition, plaintiff could not provide a history of any known injury or causative event (Tr. at 280). Plaintiff denied any current medications (Tr. at 280).

Plaintiff was described as a "well-developed, well-nourished, male . . . alert and fully oriented," able to dress and undress and place himself onto and off the table without assistance (Tr. at 281).  Dr. Runde observed full range of motion in all joints in plaintiff's arms, elbows, wrists, hands, knees, and hips (Tr. at 281-82).  Dr. Runde made no objective findings and concluded that plaintiff's complaints were "[s]ubjective only" (Tr. at 282).  Dr. Runde found no work-status restrictions because plaintiff could sit, stand, walk, lift, carry, handle objects, hear, speak, and travel without difficulty (Tr. at 282)

On August 9, 2007, State agency psychologist, Michael Stacy, Ph.D., completed a psychiatric review assessment (Tr. at 286).  The report noted plaintiff did not allege disability due to mental impairment (Tr. at 296).  In addition, he did not report any current medications for mental-health issues (Tr. at 296).  Dr. Stacy concluded plaintiff had a non-severe medically determinable impairment of situational depression that had been "improved with routine treatment" (Tr. at 286, 289, 296).  Dr. Stacy found that plaintiff had mild restrictions in activities of daily living; mild difficulties in social functioning; mild deficiencies in concentration, persistence, or pace; and no episodes of decompensation of extended duration (Tr. at 11).

On August 21, 2007, plaintiff returned to Dr. Holman to establish care and discuss disability (Tr. at 310). Dr. Holman noted a past medical history of asthma, CAH, and hypertension (Tr. at 310). Plaintiff reported taking steroids for CAH, blood pressure medications, and Albuterol for asthma (Tr. at 310). Plaintiff advised that he was "doing well" on his steroids (Tr. at 312). Dr. Holman recommended follow-up tests "to see if he has COPD rather than asthma alone" given plaintiff's smoking history (one pack of cigarettes per day for 18 years) (Tr. at 312, 310). Dr. Holman advised plaintiff on various cessation techniques and informed plaintiff that smoking "is a huge problem concerning his asthma and his health in general" (Tr. at 312).

Dr. Holman and plaintiff also discussed plaintiff's depression (Tr. at 310). Plaintiff noted that he had taken Lexapro in the past, but "he did not like it because it made him feel different" (Tr. at 312). Plaintiff expressed concern for bipolar disease,[2] but Dr. Holman concluded that plaintiff did not have bipolar disease because there was "no history of mania" (Tr. at 311). Dr. Holman noted that plaintiff's "emotional problems and his inability to hold a job . . . play a significant role in

_____

[2]Bipolar disorder involves periods of elevated or irritable mood (mania), alternating with periods of depression. The "mood swings" between mania and depression can be very abrupt.

14

his inability to work" (Tr. at 312).  Dr. Holman indicated they
would discuss an antidepressant prescription during future visits
(Tr. at 312).  Dr. Holman noted that plaintiff's "biggest
limiting factors would be his asthma and his likely depression.
Once these are under control, he may be able to be a productive
citizen.  He has done vocational rehab in the past and states
that this has not been helpful." (Tr. at 312).

On September 18, 2007, plaintiff returned to Dr. Holman for
a follow-up visit (Tr. at 313).  Plaintiff reported improvement
with new asthma medication (Tr. at 313).  Dr. Holman observed
that plaintiff's skin was sunburned "likely due to the increased
work that he has been doing, mowing lawns" (Tr. at 311).
Plaintiff reported his mood was "somewhat improved," but asked
for a referral for a psychiatric evaluation for bipolar disease
(Tr. at 313).  Dr. Holman provided a referral though he
"d[id] not see any clinical history that jumps out as bipolar
disease" (Tr. at 314).

Between January 2008 and August 2008, plaintiff returned to
the Family Health Center for monthly follow-up visits, primarily
for treatment of pain in his neck, right shoulder, arms, and back
(Tr. at 317-28).  Plaintiff's pain was treated primarily with
ibuprofen, Aleve, a muscle relaxer, and range of motion exercises
(Tr. at 317-28).  On February 26, 2008, Dr. Holman wrote, "At our

last visit, I was concerned about a little bit of decreased hand grip of the right, but whenever I was doing other examinations it seems to be normal." A magnetic resonance imaging scan ("MRI") of the cervical spine was ordered (Tr. at 304-05). It showed lordosis at C5-6 and below; moderate narrowing of the neural foramen at C3-4; left lateral osteophyte formation at C4-5; compression of the right neural foramen at C5-6; slight disc bulging/posterior osseous ridging at C6-7; and no disc herniation or significant compression of the neural canal at C7 -Tl (Tr. at 304-05). An MRI of the thoracic spine showed subtle compression of the left margin of the thecal sac at T7-8; mild to moderate compression of the thecal sac at T8-9; and slight compression of the thecal sac at Tll-12 (Tr. at 306-07).

Between January 2008 and August 2008, plaintiff was not taking any antidepressant medication (Tr. at 317-28). On the June 24, 2008, visit, Dr. Holman wrote: "Disability. Per patient's request, a note was written today and is included in part of the chart. In this note, descried that, due to patient's condition, he has not been able to continue working fields, which he has prior training or experience in. He is not completely disabled and could have a job if further training was provided." (Tr. at 325).

On May 8, 2008, plaintiff saw John Small, Ph.D., for depression (Tr. at 308). Dr. Small found that plaintiff suffered from depression and "extreme lability," which he stated was a side effect to the steroids taken for CAH (Tr. at 308, 434). He noted that "even with (anti-depression) medication he does poorly" (Tr. at 434). Dr. Small concluded that plaintiff is a "total failure in the work force" due to his mental and physical conditions (Tr. at 436). Dr. Small suggested that "we all work together . . . to help Bryce get disability." (Tr. at 436). On June 24, 2008, plaintiff saw Dr. Small whose complete medical record reads as follows: "Bryce is gaining weight. He had his blood pressure medicine changed. He must cut down on his eating since he cannot exercise.[3] They will also check with Karen Bill *[plaintiff's disability attorney]* to see if he should get another physician who will support disability. His present physician says he can answer phones. He also need[s] to get his driver's license back." (Tr. at 436). At one point plaintiff had reported that he lost his license due to non payment of child support (Tr. at 365); on another occasion he reported having lost his license due to DUI (Tr. at 375). On July 15, 2008, the records reflect that plaintiff "stopped taking BP [blood pressure] meds." (Tr. at

---

[3]This is clearly a recitation of what plaintiff reported as Dr. Small is a psychologist, not a physician, and therefore would not be qualified to conclude that plaintiff "cannot exercise."

437).  By August 27, 2008, he had "stopped taking another BP
med." (Tr. at 437).

On September 12, 2008, plaintiff began care with Bridget
Early, M.D., following a referral from Dr. Small (Tr. at 365).
Dr. Early observed a "pleasant, male, . . . with good eye
contact, speech normal rate and cadence and coherent" (Tr. at
367).  Plaintiff reported that he was an unemployed landscaper,
construction worker, and car stereo installer who had been fired
over "not showing up due to drinking or depression" and was "not
motivated now" (Tr. at 367).  Plaintiff continued to smoke, and
he reported continued drinking once or twice a week, two to six
beers.  Dr. Early recommended a psychiatric evaluation for
bipolar disorder, laboratory work to monitor steroid levels and
check for diabetes, and hip x-rays (Tr. at 368).

Upon referral by Dr. Early, Kate Branham, FNP, evaluated
plaintiff on October 28, 2008, and assessed him with depression
with anxiety (Tr. at 375).  Ms. Branham observed plaintiff's
"dissatisfaction with his life but he seems unable to even
imagine changes he could make to improve [his] situation such as
going to AA for help with drinking" (Tr. at 375).  Plaintiff
reported that he had not worked since 2005 and had "lost his job
due to absences related to drinking" (Tr. at 375).  She observed
him to be a "slightly depressed appearing male" with a normal

rate of speech and cadence, coherent thought processes, normal eye contact, normal concentration, "beleagured" attitude, and no suicidal ideation who "blames others for all the mishaps in his life" (Tr. at 375). Ms. Branham prescribed Paxil (Tr. at 375).

Between February 2009 and September 2009, Dr. Early saw plaintiff on several occasions, primarily for treatment of pain in his neck, right shoulder, hips, lower back, and feet (Tr. at 377–392).

On March 19, 2009, Dr. Early stated plaintiff had been trying conservative treatment with worsening symptoms (Tr. at 383). During this time, Dr. Early ordered several diagnostic tests. In March 2009, a bone density examination of the spine and hips showed the lumbar and femoral-neck spine bone mineral densities were within normal range, while the total hip bone mass density was below the expected range for plaintiff's age (Tr. at 417–18). X-rays of the hips and pelvis in March 2009 showed no fractures or dislocations in the hips, but mild bilateral degenerative joint disease was observed (Tr. at 416). Additional x-rays of the hips and cervical spine showed some impingement in the left hip, a normal cervical spine, except for "mild degenerative changes" and bony outgrowths (Tr. at 419-20).

In June 2009, a CT showed narrowing in the cervical spine due to bony outgrowths (Tr. at 422). X-rays of plaintiff's feet

showed only a "soft tissue prominence" on the right side of the left foot "with no evidence of underlying bony deformity" (Tr. at 423-24).  Dr. Early noted that plaintiff's foot pain etiology was "unclear," but that strain may be "exacerbated by wearing flip-flops" (Tr. at 391).  Other x-rays of the cervical spine revealed moderate cervical spondylosis without subluxation between extension and flexion (Tr. at 362).  In a June 9, 2009, letter to Child Support Enforcement, Dr. Early described plaintiff as disabled due to COPD, CAH, chronic pain in his joints with decreasing mobility, and depression (Tr. at 425).  "He is currently on disability from Medicaid.  It is my opinion that Mr. Miller is, in fact, disabled and unable to work at this time."

In September 2009, X-rays of plaintiff's back showed a "[w]edge-like deformity of the thoracic spine which appears to have been present on an older MRI," degenerative disk disease in the upper lumbar spine, and degenerative joint disease in the lower lumbar and upper sacral spine (Tr. at 441).  An electromyograph ("EMG") of plaintiff's arms was normal, except for left moderate carpal tunnel syndrome and nerve damage in the neck (Tr. at 445).

On September 5, 2009, Dr. Small stated in a Medical Assessment of Ability to do Work-Related Activities (Mental) that plaintiff had severe and marked limitations in all eight areas

listed (Tr. at 434).  He checked "poor or none" for all of the following abilities:

❑ Follow work rules

❑ Relate to co-workers

❑ Deal with the public

❑ Use judgment

❑ Interact with supervisors

❑ Function independently

❑ Maintain attention/concentration

When asked to describe the medical/clinical findings that support his assessment, Dr. Small wrote, "Bryce is depressed - even with medication he does poorly.  He has no adrenal glands. This makes him take steroids continually producing extreme lability in his [illegible]." (Tr. at 434).

Dr. Small found that plaintiff had "poor or none" in the following areas:

❑ Understand, remember and carry out complex job instructions

❑ Understand, remember and carry out detailed, but not complex, job instructions

❑ Maintain personal appearance

❑ Behave in an emotionally stable manner

❑ Relate predictably in social situations

He found that plaintiff's ability to understand, remember and carry out simple job instructions was "fair" as was his ability to demonstrate reliability (Tr. at 435). When asked to describe the medical/clinical findings that support his assessment, Dr. Small wrote, "Bryce has extreme emotional lability and depression." (Tr. at 435).

On September 16, 2009, Dr. Early stated on a narrative medical source statement that plaintiff had multiple medical problems stemming from his CAH that will require life-long steroid treatment (Tr. at 439-440, 442-443). She noted significant degenerative changes in the lumbar spine, a deformity of the right hip, a cervical nerve root compression, a bilateral neoplasm, asthma, chronic obstructive pulmonary disease, bilateral foot pain, bilateral elbow pain, and anxiety and depression with possible bipolar and frequent mood swings (Tr. at 439-40). Dr. Early concluded that plaintiff "is clearly fully disabled" (Tr. at 440).

## C. *SUMMARY OF TESTIMONY*

During the September 17, 2009, hearing, plaintiff testified; and Gary Weimholt, a vocational expert, testified at the request of the ALJ. The hearing lasted 59 minutes (Tr. at 21, 64).

## 1. Plaintiff's testimony.

At the time of the hearing, plaintiff was 32 years of age and is currently 34 (Tr. at 25). Plaintiff was unmarried but had a 15-year-old child who lived with plaintiff's former wife (Tr. at 24-25). Plaintiff had been living alone in a ground floor apartment in a four-plex for the past two and a half years (Tr. at 25-27, 45). He has no military history, and he spent a few hours in jail on one occasion for DWI and assault (Tr. at 27). Plaintiff lost his license, but he had a valid license at the time of the hearing (Tr. at 27).

Plaintiff grills a little bit, cooks, does dishes by hand a little at a time, does laundry, uses a Swiffer sweeper, shops for groceries, and carries his own packages (Tr. at 45-46). He last traveled more than a hundred miles from his home a year earlier when he went on a road trip to Salem, Missouri (Tr. at 46-47).

Plaintiff has a high school education (Tr. at 26). He was able to read newspapers and magazines, he could do simple arithmetic and fill out applications or write letters (Tr. at 26-27). Plaintiff was receiving $200 per month in food stamps, and his mother helped him pay his bills (Tr. at 27-28). He successfully filed a worker's compensation claim in 1997 for carpal tunnel syndrome and tendinitis, and he also got money from a worker's compensation claim in 1998 after a garage door broke

and hit him on the head (Tr. at 28, 29).  He filed for
unemployment benefits, but he did not get them (Tr. at 28).
Plaintiff had been on Medicaid for the past year or so but he was
only awarded Medicaid for about 18 months so he anticipated
having to reapply shortly (Tr. at 28, 48).

Plaintiff worked for a half a day in 2007 doing lawn care
for an apartment complex (Tr. at 28).  Plaintiff spends most of
his day watching television (Tr. at 29).  He goes out to pick up
his daughter occasionally or to go to the doctor (Tr. at 29).  He
sees his daughter when she needs to go somewhere (Tr. at 29).
Although the ALJ noted that plaintiff appeared to be tan,
plaintiff stated that he tans very easily and has not been
working outside (Tr. at 29).

Plaintiff worked for Pizza Hut for a year delivering pizzas
(Tr. at 30).  He quit that job because he is "very hard on cars"
and developed tennis elbow (Tr. at 30).  He also worked at
several places as a cook -- cleaning up, cooking, doing dishes, a
little bit of everything (Tr. at 30).  Plaintiff's longest job as
a cook was for McDonalds for about six months (Tr. at 30-31).  He
left that job because he "totaled out [his] car and was going to
doctor's appointments for whiplash, and they let [him] go." (Tr.
at 31).  Plaintiff worked in lawn care for four to five years at
various places (Tr. at 31-32).  He worked at JC Penney for about

three months stocking, and he left that job to go into lawn care
so he could make more money (Tr. at 32).  Plaintiff also worked
as a mechanic, helping to pull engines and replace them (Tr. at
32-33).  He worked at Jiffy Lube changing oil (Tr. at 33).

At the time of the hearing, plaintiff was 5'2" tall and
weighed 180 pounds (Tr. at 26).  When asked to describe why he
cannot work, plaintiff said he has chronic obstructive pulmonary
disease and asthma (Tr. at 34).  He has had asthma since he was a
child but it was not diagnosed until eight to ten years before
the hearing (Tr. at 34).  He continued to smoke even though his
doctor has told him to quit (Tr. at 34).  He cannot work because
it is very hard to walk, he cannot breathe, and he cannot lift
anything (Tr. at 34).  Plaintiff also has severe back pain (Tr.
at 34).  He cannot lift and it hurts to walk too long (Tr. at
34).  Someone recommended he have back surgery, but he was told
he is too young (Tr. at 34-35).  Plaintiff has never had
injections in his back for pain (Tr. at 35).  When the pain is
horrible, he goes to the doctor and gets Percocet or Tramadol
which he takes at night and he takes a lot of Ibuprofen during
the day (Tr. at 35).  No one has ever talked to him about using a
TENS unit for pain; no one has ever talked to him about the
affects of smoking on back injuries (Tr. at 35).  Plaintiff
cannot turn his neck very far from side to side (Tr. at 48).  If

he looks up, he gets a shooting pain down his arm and he loses his grip (Tr. at 48). If he looks down he gets a "real bad pulling pain" all down his spine (Tr. at 48). Plaintiff can only do dishes for about three minutes because his hands will go completely numb, get cold, and tingle, the left worse than the right (Tr. at 49). He hardly has any grip (Tr. at 49). Plaintiff lies down most of the time to relieve his pain (Tr. at 50). He does not lie down every day, but he does recline during the day (Tr. at 51). When asked why he reclines, he said, "Just watching TV and so forth." (Tr. at 51). He was then asked whether it helps with his pain, and he said it used to but now he gets extreme pressure in his lower back and has to get up or go lie down (Tr. at 51).

Plaintiff has carpal tunnel tendinitis in both hands (Tr. at 35). When asked what treatment he has had for that condition, he said, "Nothing" (Tr. at 36). He developed it in 1997, and it resulted in a worker's compensation claim (Tr. at 36). He said that it went away for a while, when he was working on engines and doing lawn work, but in the past two years it had come back (Tr. at 36). He described it as "just horrible" and said that pain wakes him up (Tr. at 36). Plaintiff has tennis elbow in both elbows for which he has had one injection (Tr. at 36). He has not gone back to the doctor for that because there is "nothing

really they can do about it." (Tr. at 36).

Plaintiff has no adrenal glands, he has been on steroids all his life, he has developed muscle deterioration, and he has osteoporosis (Tr. at 37). He has thin hip bones and he broke five ribs in a year and a half (Tr. at 37).

Plaintiff has problems with depression (Tr. at 50). He feels down because he cannot do anything, some days he does not feel like living (Tr. at 50). "[I]t's probably a good thing I don't have a gun sometimes, so." (Tr. at 50). Plaintiff does not like being in large groups of people (Tr. at 50). He was asked whether his doctor recommended he see a psychiatrist, and he said, "No. Just, I'm dealing with it." (Tr. at 52). Plaintiff was not taking any medications for depression; he had "just been pushing through" (Tr. at 52).

If plaintiff sleeps wrong, he cannot open the door on his car or turn a key with his right hand (Tr. at 51). "That happened a few months ago and it took me two weeks to come back out of it, so. And that's extremely painful." (Tr. at 51). Plaintiff takes a lot of Ibuprofen during the day but will only take the Tramadol if he does not have anything to do that day because he can barely function on that medication (Tr. at 52).

Plaintiff acknowledged that he does not have a strong work history because he either got hurt or got burned out on the job

(Tr. at 37).  Plaintiff said he quit drinking about four months earlier, and he quit playing pool two months earlier (Tr. at 38).

Plaintiff testified that he can lift five to ten pounds "but it better be real quick or I'll be down for a week." (Tr. at 39).  He testified that he never lifted more than five pounds while he was working on engines (Tr. at 39).  Plaintiff can walk a half a block maximum, and it takes him ten to 15 minutes to walk that far (Tr. at 39).  Plaintiff can sit for 20 to 30 minutes and can stand for 20 to 30 minutes (Tr. at 40).  He drove to the hearing; he can drive "very short distances" (Tr. at 39-40).

The ALJ asked plaintiff about a medical record dated April 24, 2007, which said plaintiff complained of pain in his right elbow because he had been repeatedly throwing shingles while helping someone roof a house (Tr. at 41).  Plaintiff said he did that in 2006, even though the record said 2007:  "I wasn't roofing, I know that." (Tr. at 41).  Plaintiff said he was on the ground cleaning up for his best friend, not up on the roof and he was not throwing shingles (Tr. at 41).  When asked where he was throwing shingles, he said, "In their dump trailer." (Tr. at 41-42).  In June 2007 when he filled out his application for benefits, he was helping his step father mow and use a gas-powered weedeater (Tr. at 42).

At the time of the hearing, plaintiff was taking Hydrocortisone, 10 mg. twice a day; Flugerol Cortisone, .1 mg daily; Albuterol twice a day; Spiriva once a day; Tramadol for pain; and some kind of pre-diabetic medicine (Tr. at 43). Plaintiff continues to smoke; "I tried Chantix. It was a free basis and it worked. I can't afford it now." (Tr. at 43). Plaintiff experiences hot flashes, dizziness and a "real dry throat" from his medication (Tr. at 43-44). He has osteoporosis and dentures due to bone deteriorations from his adrenal gland medication (Tr. at 47). The degenerative disc disease in plaintiff's neck and back could be related to the steroids (Tr. at 47). Pre-diabetes has occurred due to weight gain and not doing anything (Tr. at 48).

Plaintiff stopped using alcohol a month or a month and a half before the hearing (Tr. at 44). Plaintiff used cocaine and marijuana but had not used them in the two years before the hearing (Tr. at 44). He used marijuana once or twice and used cocaine four or five times (Tr. at 45).

**2.  Vocational expert testimony.**

Vocational expert Gary Weimholt testified at the request of the Administrative Law Judge.

The first hypothetical involved a person who could perform light work; could occasionally climb stairs and ramps, stoop,

kneel, crouch or crawl; never climb ropes, ladders, or scaffolds; and should avoid concentrated exposure to fumes, odors, dust and gas (Tr. at 57). The vocational expert testified that such a person could perform plaintiff's past relevant work as a delivery driver with 5,000 such positions in Missouri, a short order cook with 7,500 positions in Missouri, or an automobile lube specialist with 4,500 positions in the state (Tr. at 57).

The second hypothetical was the same as the first except the person would need a sit/stand option with the ability to change positions frequently, and could frequently handle, manipulate and finger (Tr. at 58). The vocational expert testified that the person could not do any of plaintiff's past relevant work but could work as a cashier, D.O.T. 211.462-010, with about 3,000 in the state and 150,000 in the country; an inspector/hand packager, D.O.T. 559.687-074, with approximately 2,500 in the state; or an information clerk, D.O.T. 237.367-018, with 1,200 in the state and 60,000 in the nation (Tr. at 58-59).

The third hypothetical was the same as the second except the person could only occasionally handle, finger, or manipulate (Tr. at 59-60). The vocational expert testified that such a person could be an information clerk but could not do the other jobs from hypothetical two (Tr. at 60).

The fourth hypothetical was the same as the third except the person would miss work four times per month (Tr. at 60). The vocational expert testified that such a person would be unemployable (Tr. at 60). If the person were to miss only two days per month, he would still be unemployable (Tr. at 60-61).

If the person would have trouble looking up or down, he could still be an information clerk but not the other jobs (Tr. at 61).

## V. *FINDINGS OF THE ALJ*

Administrative Law Judge Victor Horton entered his opinion on October 26, 2009 (Tr. at 8-18). The ALJ found that plaintiff's last insured date was March 31, 2010 (Tr. at 8, 10).

Step one. Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 10).

Step two. Plaintiff has congenital adrenal hyperplasia, carpal tunnel syndrom, tendinitis, tennis elbow status post injections in the right elbow, degenerative disc disease, and mild but persistent asthma, all of which are severe impairments (Tr. at 10). Plaintiff's hypertension, obesity, and right hip deformity are not severe (Tr. at 10). He has no impairment of his knees, ankles or feet that has imposed more than minimal work-related limitations for any continuous period of 12 months (Tr. at 10-11). His mental impairment is not severe; he has only

31

mild restrictions of activities of daily living; mild difficulties maintaining social functioning; mild difficulties maintaining concentration, persistence, and pace; and no episodes of decompensation of extended duration (Tr. at 11).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr at 11).

Step four.  Plaintiff has the residual functional capacity to perform light work but can only occasionally climb stairs and ramps, stoop, kneel, crouch or crawl; can never climb ropes, ladders or scaffolds; and he must avoid concentrated exposure to fumes, odors, dust and gases (Tr. at 11).  With this residual functional capacity, plaintiff cannot return to his past relevant work (Tr. at 17).  However, he can work as a deliverer, short order cook, or automobile lubrication specialist, all of which are available in significant numbers in the national economy (Tr. at 18).  Therefore, plaintiff was found not disabled (Tr. at 18).

## VI.  OPINIONS OF DRS. EARLY AND SMALL

Plaintiff argues that the ALJ erred by relying on his own opinion rather than the opinions of plaintiff's treating doctors, Dr. Small (a psychologist) and Dr. Early (a medical doctor).

The ALJ stated in his opinion that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and

32

other evidence, based on the requirements of 20 CFR 404.1529 and
416.929 and SSRs 96-4p and 96-7p." (Tr. at 11). He also
"considered opinion evidence in accordance with the requirements
of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and
06-3p." (Tr. at 11).

John R. Small, Ph.D., prepared a narrative medical source
statement on June 2, 2008. Dr. Small stated that the
claimant was on a long-term regimen of Prednisone and that
this medication was known to cause side effects such as
emotional lability. He also stated that the claimant had
depression, consistent with a bipolar disorder, with
symptoms such as anhedonia, ruminating thoughts, lack of
concentration, poor social relations, and anger. He
concluded that the combination of the claimant's mental and
physical difficulties resulted in the claimant's total
failure in the work force. He recommended that the
claimant's treating sources work together to help the
claimant receive disability benefits.

* * * * *

Dr. Small completed a Medical Assessment of Ability to do
Work-Related Activities (Mental) on September 5, 2009. He
stated that the claimant was seriously limited in his
ability to understand, remember, and carry out simple
instructions as well as in his ability to demonstrate
reliability. He further stated that the claimant had no
useful ability to function in any of the other 11 work
related areas he assessed.

Although the claimant did not allege a mental impairment
when he filed his application for benefits, Dr. Small has
indicated that the claimant has almost no useful ability to
function. As a treating psychologist, one would expect to
see detailed treatment records that would document severe
symptoms and findings, as well as restrictions placed on the
claimant in the course of treatment. Either Dr. Small would
not provide, or the claimant did not obtain, such records.
In any event, Dr. Small's conclusions are not supported by
treatment notes or any other evidence of record. While
supportive of the claimant's disability, Dr. Small

33

apparently relied heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to accept as true most, if not all, of what the claimant reported. Nevertheless, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints. The opinions expressed by Dr. Small are quite conclusory, with very little explanation of the evidence relied on in forming his opinions. His opinions are not entitled to substantial weight.

* * * * *

Bridget Early, M.D., prepared a narrative medical source statement on September 16, 2009. She stated that the claimant had multiple medical problems stemming directly from his congenital adrenal hyperplasia. She indicated that this condition will require life-long corticosteroid and mineral corticoid replacement. She also indicated that the claimant had significant degenerative changes in the lumbar spine, a deformity of the right hip, a cervical nerve root compression, a bilateral neoplasm, likely due to adrenal rest cell tumors, asthma, chronic obstructive pulmonary disease, bilateral foot pain, and bilateral elbow pain. Dr. Early concluded that the claimant's multiple problems prevented the claimant from working.

Dr. Early indicated that she had only been treating the claimant since approximately September of 2008. Nevertheless, she has described some impairments and objective findings that would reasonably cause significant limitations. She did not, however, describe specific limitations and instead stated that the claimant was "clearly fully disabled." However, opinions that a claimant is "disabled" are not medical opinions, but opinions on the application of Social Security statutes, a task assigned solely to the discretion of the Commissioner of Social Security. These statements are not conclusive as to the ultimate question of disability. 20 CFR 404.1527(e) and 416.927(e); and SSR 96-5p. Her findings and opinions have convinced the undersigned that the claimant is limited to the extent found in this decision.

(Tr. at 13-15).

A treating physician's opinion is granted controlling weight
when the opinion is not inconsistent with other substantial
evidence in the record and the opinion is well supported by
medically acceptable clinical and laboratory diagnostic
techniques.  <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005);
<u>Ellis v. Barnhart</u>, 392 F.3d 988, 998 (8th Cir. 2005).  An ALJ may
discount the opinion of a treating physician "where other medical
assessments are supported by better or more thorough medical
evidence, or where a treating physician renders inconsistent
opinions that undermine the credibility of such opinions."
<u>Medhaug v. Astrue</u>, 578 F.3d 805, 815 (8th Cir. 2009).

**Dr. Early**.  Plaintiff began seeing Dr. Early in September
2008 upon referral from Dr. Small who had advised plaintiff to
"get another physician who will support disability . . . [because
the] present physician says he can answer phones".  A year later
Dr. Early prepared a narrative medical source statement dated
September 16, 2009, in which she named all of plaintiff's
impairments and then, without making any findings as to his
residual functional capacity, concluded that plaintiff "is
clearly fully disabled." (Tr. at 439-440).

Dr. Early's opinion that plaintiff "is clearly fully
disabled" is entitled to no deference.  Whether a claimant can do
substantial gainful activity is an issue solely for the ALJ.  <u>See</u>

Nelson v. Sullivan, 946 F.2d 1314, 1316 (8th Cir. 1991) (opinions
that a claimant cannot be gainfully employed are "not medical
opinions but opinions on the application of the [Social Security]
statute, a task assigned solely to the discretion of the
[Commissioner]").  Therefore, Dr. Early's opinion on that issue
is not entitled to controlling weight as a medical opinion of a
treating source.  See SSR 96-5p ("Treating source opinions on
issues that are reserved to the Commissioner are never entitled
to controlling weight.") (emphasis added); House v. Astrue, 500
F.3d 741, 745 (8th Cir. 2007) ("A treating physician's opinion
that a claimant is disabled or cannot be gainfully employed
gets no deference because it invades the province of the
Commissioner to make the ultimate disability determination.").

Dr. Early's medical records establish that:

❒ On September 12, 2008, plaintiff continued to drink and
smoke, although he had cut down on both.  He had been fired from
his last job because of drinking and was no longer motivated to
work.  Dr. Early ordered lab work and x-rays, recommended he be
evaluated by a psychiatrist, and encouraged him to stop smoking.
She did not prescribe any medication or treatment, nor did she
recommend plaintiff restrict his activities in any way.

❒ On September 19, 2008, plaintiff said, "I don't know the
reason I'm here."  She diagnosed limb pain and told plaintiff to

come back as needed.  She did not prescribe any medication or therapy, nor did she recommend plaintiff restrict his activities in any way.

❐ On October 2, 2008, plaintiff complained of elbow pain – he said he could no longer shave with his right arm because it would shake, although he could write with it.  The MRI of his cervical, thoracic, and lumbar spine was normal.  She prescribed Vicodin (narcotic) for five days, a muscle relaxer for 30 days, recommended and injection in his elbow and ice.  On October 7, 2008, Dr. Early refilled plaintiff's Vicodin for 30 days.

❐ On February 18, 2009, plaintiff said he had been doing low impact home exercises three or four times a day, four to six days per week, for periods of 20 to 30 minutes daily.  Plaintiff's hip pain had improved and he had not gotten hip x-rays.  On exam Dr. Early found only mild weakness of plaintiff's right triceps.  She did not limit any of plaintiff's activities, nor did she prescribe any pain medication.

❐ On March 6, 2009, Dr. Early noted that plaintiff "likely has osteoporosis given his multiple fragility fractures"; however, plaintiff had never been assessed by Dr. Early with any fracture. She had reviewed "old records" which showed a rib fracture from coughing; however, there is no indication of how "old" those records were and they do not appear in this record.  She ordered

lab work and x-rays and prescribed a medication for smoking cessation. She did not prescribe any pain medication or advise plaintiff to restrict any of his activities.

❒ On March 16, 2009, Dr. Early noted that plaintiff's hip x-rays showed "mild" bilateral hip degenerative joint disease. He had diminished motor strength in his right arm. She prescribed a nerve pain medication. Three days later, on March 19, 2009, she decided to proceed with a CT scan after having tried "conservative management and home exercise program for past year". Four days later, Dr. Early filled a prescription for Percocet (narcotic) for ten days.

❒ On May 6, 2009, plaintiff came in to discuss x-ray results. He had started smoking again and was up to a pack per day. "[H]ad quit for 4-5 months, started going out, had run out of Chantix." Dr. Early noted that plaintiff's x-rays showed only "mild" degenerative changes. She referred him to an orthopedic doctor - she did not prescribe any medications for pain, nor did she advise him to restrict any activities.

❒ On April 22, 2009, Dr. Early noted that plaintiff was on no medications (Tr. at 406). On May 15, 2009, plaintiff was still on no medication (Tr. at 407). On June 9, 2009, plaintiff called Dr. Early's office and said his driver's license had been suspended for failure to pay child support but that he could get

his license back if he could get documentation from a doctor saying he could not work at this time (Tr. at 409). "Please write him a notification for State that he is Disabled" was the message to Dr. Early. Dr. Early did indeed write a letter that said, "It is my opinion that Mr. Miller is, in fact disabled and unable to work at this time." (Tr. at 425).

❑ On June 18, 2009, Dr. Early acknowledged that plaintiff was on no medication (Tr. at 410). On June 29, 2009, plaintiff reported pain in his back after sitting for more than an hour. Plaintiff told Dr. Early that he saw an orthopedic doctor who said plaintiff needed back surgery but the doctor would not do it because plaintiff is too young. There are no records from that orthopedist in this record, nor is there any indication that Dr. Early reviewed any. She prescribed a muscle relaxer.

❑ On July 6, 2009, plaintiff complained of foot pain. His x-rays were normal and Dr. Early surmised he may be getting foot pain due to wearing flip-flops. Dr. Early reviewed the orthopedic notes on this visit and remarked that the doctor "expressed concern that surgery would cause further degenerative changes above or below the levels treated." Dr. Early recommended that plaintiff have a nerve conduction study on both wrists and suggested getting a second opinion from another orthopedic doctor. She did not prescribe any medications or

advise plaintiff to restrict his activities.  On July 30, 2009, Dr. Early noted that plaintiff was on no medication (Tr. at 412).

As the ALJ noted, Dr. Early's medical records do not support a finding that plaintiff is disabled.  Dr. Early never restricted plaintiff's activities, she treated him conservatively, and she did not indicate in her opinions which of plaintiff's functions were limited in order to disable him.  Her opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques, nor is it supported by her own medical records.  The ALJ did not err in discounting her conclusory opinion that plaintiff is disabled.

**Dr. Small**. Dr. Small was plaintiff's psychologist; however, plaintiff saw Dr. Small on only a few occasions and there is no evidence that Dr. Small ever did anything for plaintiff other than advocate for disability benefits.

❐  On June 2, 2008, Dr. Small wrote a letter to plaintiff's disability lawyer.  It recounts how plaintiff first saw Dr. Small on May 8, 2008, after having been denied disability benefits (there are no records from Dr. Small dated prior to this June 2, 2008, letter).  He then stated that plaintiff was taking Prednisone which has a side effect of emotional lability.  Dr. Small stated that plaintiff's "mental difficulties, physical difficulties and the interaction of both, have had the result of

Bryce's total failure in the work force." He suggested everyone work together to get plaintiff on disability.

❑ On June 24, 2008, plaintiff either called Dr. Small's office or saw him – it is not clear from the one-paragraph record. Plaintiff complained of gaining weight due to a change in his blood pressure medicine. The record says, "They will check with Karen Bill to see if he should get another physician who will support disability" because plaintiff's current physician did not believe plaintiff was disabled. Regardless of whether this was an office visit or a phone call, Dr. Small made no assessments and provided no treatment or recommendations. He did, however, include the wording to a letter which was unaddressed:

> Good Morning.
>
> Bryce Miller is under my care for some very difficult problems in his life. Some are psychological and some physical. His physical and psychological problems are such that we are trying to get Disability Status for Bryce. He cannot work at this time. One of the side effects of his not being able to work is that he cannot pay his child support. His daughter needs him in her life. If Bryce was able to get his driver's license back, it would help both him and his daughter. Whatever we need to get the process going, we are willing to do.
>
> Humbly submitted,

❑ On July 15, 2008, there is a one-line record, again unclear as to whether this referred to an office visit or a phone call. It did not deal with any mental issues. The record says, "Stopped taking BP meds. Get in to M.D. See in two weeks."

41

❒ On August 27, 2008, Dr. Small essentially wrote a few lines about what plaintiff had reported with regard to his physical condition – there is nothing in this record about plaintiff's mental condition: "Bryce with John and Laura. Bryce will see Dr. Early Sep. 15. He has stopped taking another BP med. Broken ribs, trouble sleeping, financial stress. Bryce will call to see if he can get into Dr. Early sooner. We will meet in three weeks." There are no medical records containing a diagnosis or treatment for broken ribs. Dr. Early reviewed some unidentified "old records" which indicated plaintiff had previously broken ribs; however, those records are not in the administrative transcript and could pertain to a condition plaintiff suffered as a child for all we know.

❒ On September 5, 2009, Dr. Small completed the check-mark Medical Assessment form at issue, finding that plaintiff had poor or no ability to do anything except be reliable and understand, remember and carry out simple job instructions which he marked as fair. In support he wrote that plaintiff has "extreme emotional lability and depression."

The sole symptom relevant to any mental impairment that appears in Dr. Small's records is "emotional lability." However, Dr. Small merely says that emotional lability is a possible side effect of Prednisone. There is *no evidence* that plaintiff

actually experienced emotional lability as a result of taking any medication.  In fact, the only time lability is mentioned in the record or in plaintiff's brief is in reference to Dr. Small's letter indicating that emotional lability is a possible side effect of Prednisone.

There is no evidence that Dr. Small ever even so much as interviewed plaintiff.  He was a very strong advocate for disability benefits and nothing else.  He never did any testing, never did any counseling nor did he suggest that plaintiff participate in counseling, he never provided any form of treatment.  His opinion is absurd given the record, an example of which is his opinion that plaintiff has "poor or no" ability to function independently when plaintiff was living by himself and was able to go on one-hundred-mile road trips.

The ALJ did not err in discounting the opinion of Dr. Small.

## VII. MENTAL IMPAIRMENT

Plaintiff argues that the ALJ erred in finding that plaintiff's mental impairment is not severe.  The ALJ had this to say about plaintiff's mental impairment:

> Michael Stacy, Ph.D., reviewed the medical evidence for the State agency on August 9, 2007.  Dr. Stacy stated that although the claimant was being treated for depression, his impairment was not "severe."  He noted that the claimant did not allege a disability due to a mental impairment, he did not list any medications for a mental health condition, and the field office did not observe any mental health limitations.  Dr. Stacy stated that the claimant had the

43

following functional limitations:  mild restrictions of
activities of daily living; mild difficulties maintaining
social functioning; mild difficulties maintaining
concentration, persistence, and pace; and no episodes of
decompensation of extended duration.  Dr. Stacy's findings
are generally consistent with the medical evidence of record
and entitled to substantial weight.

* * * * *

With regard to his alleged mental impairments, there have
been no psychiatric hospitalizations and, although he has
been treated by a psychologist, no treatment records of the
psychologist have been submitted.  The claimant has not been
treated regularly by a psychiatrist for medical management
of a mental impairment.  The absence of consistent treatment
during a period of alleged disability is inconsistent with
severe and disabling symptoms.  The undersigned finds no
persuasive evidence that the claimant has been refused
medical treatment due to an inability to pay.

* * * * *

. . .  He did not list any medication being prescribed to
treat a mental impairment.  Furthermore, although the
claimant has alleged that his medications have caused him to
be tired and to gain weight, complaints of persistent side
effects are not found in the treatment notes of the
claimant's physicians.

* * * * *

Another factor influencing the conclusions reached in this
decision is the claimant's generally unpersuasive appearance
and demeanor while testifying at the hearing.  The claimant
displayed no apparent evidence of pain or discomfort and he
had no apparent difficulty understanding or responding to
questions posed to him.  It is emphasized that this
observation is only one of many factors being relied upon in
reaching a conclusion regarding the credibility of the
claimant's allegations and residual functional capacity but
it is entitled to some weight.

(Tr. at 15-17).

A severe impairment is an impairment or combination of impairments which significantly limits a claimant's physical or mental ability to perform basic work activities without regard to age, education, or work experience. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The regulations, at 20 C.F.R. § 404.1521, define a non-severe impairment.

(a) Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

(b) Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include--

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

Plaintiff did not indicate in his applications for disability that he had a mental impairment. He testified that he had not taken any medications for depression nor had he seen a

psychiatrist.  Rather he was "dealing with it" and "just pushing through."  His only medical records from a mental health professional are those of Dr. Small, which were discussed in more detail above, but essentially showed no symptoms, no diagnoses, and no treatment for any mental health condition.

Plaintiff argues that "several treating sources diagnosed the Plaintiff as having a severe mental impairment that interfered with his ability to perform basic work activities." He first cites Dr. Andrew Quint who "diagnosed the Plaintiff with possible bipolar disorder on September 18, 2007".  Contrary to plaintiff's assertion, Dr. Quint wrote "There is no history of mania, so I do not think that he has bipolar" (Tr. at 311).  In addition, Dr. Quint noted that plaintiff's "SIGECAPS was negative except for energy."  SIGECAPS is a mnemonic device used to remember the symptom indicators for depression:

**S**leep decreased (Insomnia with 2-4 am awakening)

**I**nterest decreased in activities (anhedonia)

**G**uilt or worthlessness (Not a major criteria)

**E**nergy decreased

**C**oncentration difficulties

**A**ppetite disturbance or weight loss

**P**sychomotor retardation/agitation

**S**uicidal thoughts

According to Dr. Holman (which was expressly agreed with by Dr. Quint), plaintiff's symptoms were negative except for energy, meaning that he did NOT suffer from decreased sleep, decreased interest in activities, feelings of guilt or worthlessness, concentration difficulties, appetite disturbance, psychomotor retardation or agitation, or suicidal thoughts.

The only other evidence of a mental impairment cited by plaintiff in his brief is: (1) the allegations by Dr. Small which were properly found not credible, (2) the list of symptoms plaintiff reported in a "review of symptoms" form, and plaintiff's own testimony which was found not credible by the ALJ (a finding not challenged by plaintiff in this appeal). As far as the review of symptoms, plaintiff states that he was "positive for depression, anxiety, high stress levels, sleep disturbances, and suicidal thoughts. (TR 376)" However, that medical record indicates that plaintiff was "slightly depressed" (Tr. at 376), and had no suicidal ideation. His appearance and behavior were appropriate, his speech was normal, thought processes were coherent, eye contact normal, concentration normal, appetite unchanged, and no hallucinations. The nurse practitioner noted that plaintiff blames others for all the mishaps in his life and was not willing to consider making changes (such as going to AA to help him stop drinking) that would improve his life.

Contrary to plaintiff's assertions, he has never been diagnosed with bipolar disorder. Dr. Holman and Dr. Quint indicated he did not have bipolar disorder (Tr. at 311, 314). Dr. Early recommended a psychiatric evaluation for possible bipolar after plaintiff's mother stated she thought plaintiff may have undiagnosed bipolar disorder. There are no other records by doctors discussing bipolar disorder, and no one actually diagnosed it. Indeed, plaintiff's own recitation of the medical records in his brief points to no diagnosis of bipolar disorder - only the two instances I just mentioned where it was referenced by Drs. Holman/Quint and Dr. Early.

Here, the evidence establishes that plaintiff's mental impairment is non-severe. Plaintiff's mental status evaluations of record consistently describe an alert, oriented, pleasant male with normal speech, concentration, thought process, grooming, eye contact, and behavior (Tr. at 243, 263, 268, 270, 278, 281, 296, 320, 325, 327, 340, 343, 347, 356, 367, 378, 386). Furthermore, multiple treating physicians observed that plaintiff's depression was mild, slight, or situational and related to normal life stressors, such as divorce and loss of financial independence (Tr. at 236, 268, 269, 271, 272, 375-76, 437). See Dunahoo v. Apfel, 241 F.3d 1033, 1039-40 (8th Cir. 2001) (holding that depression was situational and not disabling because it was due

to denial of food stamps and workers compensation and because there was no evidence that it resulted in significant functional limitations); <u>Mitchell v. Sullivan</u>, 907 F.2d 843 (8th Cir. 1990) (situational depression is not disabling).

The ALJ also relied on the absence of consistent treatment for plaintiff's alleged mental impairments. The record shows brief and intermittent treatment. In January 2006, plaintiff reported depression to his treating physician and requested medication. Although the physician deemed the depression to be "situational" and advised against an antidepressant medication, he prescribed Paxil. Plaintiff, however, discontinued the medication after "a couple of days . . . [and] never bothered to call to get an alternate medication." In February 2007, plaintiff began taking Lexapro, but he quit within two months despite reporting that it made him feel "much better" and "seem[ed] to be working" (Tr. at 266, 268, 296). An impairment that can be controlled by treatment "cannot be considered disabling." <u>Brown v. Barnhart</u>, 390 F.3d 535, 540 (8th Cir. 2004). Plaintiff did not take antidepressant medication again until October 28, 2008, when he was prescribed Paxil again to help with depression, anxiety, and sexual dysfunction. Although plaintiff reported taking Paxil in February and March 2009 (Tr. at 377, 379), he stopped Paxil by March 16, 2009, and never

resumed it (Tr. at 382-92).  At the September 2009 administrative hearing, plaintiff testified that he was not taking any medications for depression and was "just pushing through."  An absence of treatment indicates that a mental impairment is non-severe.  <u>Williams v. Sullivan</u>, 960 F.2d 86, 89 (8th Cir. 1992).

As for counseling, plaintiff first sought therapy on May 8, 2008.  The record shows only four communications between plaintiff and his psychologist, John Small, Ph.D., with the last one on August 27, 2008.  In September 2008, plaintiff reported to his treating physician that had never seen a psychiatrist (Tr. 370).  At the September 2009 hearing, plaintiff testified that he was not seeing a psychiatrist nor had his treating physician advised him to see a psychiatrist, and he had just been "dealing with it" on his own.  The Eighth Circuit has noted that the absence of any evidence of ongoing counseling or psychiatric treatment disfavors a finding of disability.  <u>Roberts v. Apfel</u>, 222 F.3d 466, 469 (8th Cir. 2000) (citing <u>Dixon v. Sullivan</u>, 905 F.2d 237, 238 (8th Cir. 1990)).

Plaintiff did not allege a mental impairment in his application for disability benefits, he rarely sought treatment for a mental impairment, he stopped taking an antidepressant after acknowledging that it helped his symptoms, he was never diagnosed with bipolar disorder, his depression and anxiety were

consistently referred to as mild or situational, he never followed through on recommendations to see a psychiatrist, and he was consistently observed as having nearly normal mental presentation.  The ALJ did not err in finding that plaintiff's mental impairment was not severe.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_____/s/ Robert E. Larsen_____
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
May 31, 2011